UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANNA MCKINNEY,

     Plaintiff,

v.

COUNTY OF MACOMB,

     Defendant.

Case No. 20-13303
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18]

Anna McKinney has suffered from anxiety and depression for most of her life. But she was able to manage her symptoms and perform her job with Macomb County effectively for over a decade. That changed from 2016 to 2019, when McKinney's mental health and her job performance declined precipitously. During that time, her caseload was reduced, and she was placed on several Performance Improvement Plans to no avail.

In 2018 and early 2019, McKinney requested accommodations for her depression, anxiety, and recently diagnosed ADHD. The parties dispute whether the County's response was adequate.

By early 2019, McKinney's mental health deteriorated at an increasingly rapid clip. By April, McKinney could not work at all. By May, her doctor said she was "unable to function." After McKinney exhausted her paid leave, she was placed on unpaid, continuous medical leave through July 2019. After that leave of absence

ended, McKinney says that she was separated from the County even though she was entitled to more leave. But the County says that McKinney repeatedly failed to provide a medical certification to support additional leave, as required by her collective-bargaining agreement.

McKinney then filed suit against the County, alleging that it violated her rights under the Americans with Disabilities Act. In time, the County moved for summary judgment. For the reasons that follow, the Court will grant the motion.

## I.

As the County seeks summary judgment, the Court accepts as true McKinney's version of the events. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.

Macomb County Community Mental Health provides services to individuals with developmental disabilities, who are known within the department as "consumers." (ECF No. 18-6, PageID.485.) The County employed about 25 Supports Coordinators to go to consumers' homes, assess their needs, and make service plans to help them become "more independent or get a job or have a voice." (*Id.*; *see also* ECF No. 18-7, PageID.553.) Once a service plan was in place for an individual consumer, their assigned Supports Coordinator would meet with them once a month to assess and document their progress. (ECF No. 18-6, PageID.486.) In addition to charting a consumer's progress within the program, proper documentation was essential for the County to bill Medicaid. (ECF No. 18-9, PageID.620.) The average

Supports Coordinator was responsible for between 45 and 50 consumers. (*Id.* at PageID.622.)

Anna McKinney was hired as a full-time Supports Coordinator in 2005. (ECF No. 18-6, PageID.485.) Despite her lifelong history of depression and anxiety, everyone agrees that McKinney had no performance issues in her first ten years on the job. (ECF No. 18-6, PageID.487; ECF No. 18-9, PageID.588.)

Things started to turn in 2015. First, McKinney's job changed from a "standard office" to a "mobile office." (ECF No. 18-6, PageID.487.) This required her to write her reports in front of consumers and to spend much more time working out of her car. (*Id.* at PageID.488, 494.) Second, McKinney was diagnosed with ADHD. (*Id.* at PageID.516–517.) This combination was not good for her workflow. The job now required significantly more time management and multitasking skills, but her ADHD made that difficult. As McKinney explained in her deposition: "[ADHD makes you] think you can do more than you can. So one of my plans of service . . . you plan an hour, but maybe it took more depending on their case. And so now I'm late and late and late, you know. Stuff like that happened." (*Id.* at PageID.494–495.) She agreed that she had trouble multitasking and sometimes "couldn't write [a] report like they wanted[.]" (*Id.* at PageID.495, 531.)

By 2016, McKinney's supervisor "observed a deterioration in her mental condition affecting her ability to do her job." (ECF No. 18-7, PageID.552.) Around this time, McKinney started to take intermittent time off under the Family and Medical Leave Act, causing her to miss appointments with consumers and forcing other staff

3

to absorb her work. (*Id.* at PageID.554.) In November, McKinney was hospitalized for depression for over two weeks. (ECF No. 18-6, PageID.490; ECF No. 18-7, PageID.552.) The following month, her supervisor "removed McKinney from the rotation so she would not have any new [consumers] added to her caseload." (*Id.*; *see also* ECF No. 18-6, PageID.500.) This required other Supports Coordinators to absorb all new clients. (*Id.*) Unfortunately, this did not improve McKinney's performance.

McKinney was placed on her first Performance Improvement Plan in October 2017. (*See generally* ECF No. 18-8.) The PIP noted a pattern of untimely and inadequate recordkeeping, a failure to see consumers as frequently as required by their service plans, and insufficient documentation of McKinney's attendance and whereabouts. (*Id.*; *see also* ECF No. 18-9, PageID.624.) The PIP required McKinney to meet with her supervisor on a weekly basis to review her recordkeeping and ensure that her timesheets were accurate. (*Id.*) Though the PIP was renewed several times, her supervisor noted that McKinney's performance "continued to slide" and she "never achieved all of the goals set in the multiple PIPs that were implemented" under her supervision. (*Id.* at PageID.553–554.)

In May 2018, Steven Smith, the department head, became McKinney's direct supervisor. (ECF No. 18-9, PageID.573.) As the department head, Smith had approved the prior PIPs and believed that McKinney's performance to that point was "not good." (*Id.* at PageID.574–575.) So he renewed McKinney's PIP again, noting the same general issues. (*Id.*; *see also* ECF No. 18-10, PageID.636.) Despite the PIP,

Smith found that McKinney "consistently" demonstrated "an inability to do various elements of her job during [this] time period." (ECF No. 18-9, PageID.576–577.)

Around this time, McKinney made her first request for an accommodation, though the accounts of that request differ significantly.

McKinney says that she and her doctor submitted a request for accommodation in March 2018. (ECF No. 18-6, PageID.503.) According to McKinney's deposition testimony, she told Smith that she was "getting sick" and "this is how [she was] going to get better." (*Id.*) Smith said he would take her request to HR, "but he didn't." (*Id.* at PageID.504.) Instead, he went to another manager, who said she "didn't feel comfortable with that request." (*Id.*) It is not clear what accommodations were requested at that time. (*See id.* at PageID.503–505.)

In contrast, Smith says that he and a few others held a disciplinary-action meeting with McKinney in June 2018 to review a reprimand with her. (ECF No. 18-9, PageID.589.) At the meeting, he says that McKinney requested to work from home because she "struggles with the noise and the other people and the chaos of an office environment." (*Id.* at PageID.591.) Smith says he "encouraged her to formally request an accommodation through human resources" and noted that the County "would be very happy to review it and consider it." (*Id.*) Smith noted that McKinney's union representative was present and made a similar recommendation because that is "the process." (*Id.* at PageID.590–591; *see also* ECF No. 24-3, PageID.820.) In the meantime, Smith says he "immediately" made a private office available to McKinney to minimize any distractions at the office. (ECF No. 18-9, PageID.591.) Between that

5

meeting and early 2019, Smith said that McKinney never sought another accommodation from him. (*Id.* at PageID.596.)

Things grew worse still in 2019. In early January, McKinney was assigned to a third supervisor, though Smith remained the department head. (ECF No. 18-9, PageID.578.) The new supervisor continued the PIP, again citing problems with recordkeeping and accurate documentation of attendance. (*See* ECF No. 18-11.) The PIP noted that McKinney "averaged approximately 25.25 hours [of work] per week." (*Id.* at PageID.640.) And it said that she had "missed two authorizations for Skill Building and was referred to [the Office of Recipient Rights] for rights violation. Investigation is ongoing at this time." (*Id.*) As a result of these deficiencies, the PIP explained, "it was decided to remove 7 cases from [McKinney] due to her inability to keep up with visits and/or plans. [She] now has 35 active cases[.]" (*Id.*)

In late January 2019, McKinney submitted paperwork to extend her intermittent FMLA leave. (ECF No. 28-3, PageID.1224; *see also* ECF No. 18-2 (record of FMLA leave from 2018–19).) That paperwork apparently contained a request for accommodation. (ECF No. 24-3, PageID.835.)

On February 8, McKinney met with an HR representative. The representative "apologized" to her because he "never read the whole FMLA paper" that indicated a need for an accommodation. (ECF No. 18-6, PageID.501–502.) He told McKinney that he would initiate the interactive process. (*Id.*)

On February 14, McKinney met with a different HR representative, Rachel Chordash, about an accommodation. (*See generally* ECF No. 18-15.) At that time,

McKinney requested to work from home. (*Id.* at PageID.740.) Chordash said that once she received the necessary paperwork, she would follow up. (*Id.*)

The medical certification came in on March 12, 2019. (ECF No. 18-13, PageID.717–719.) The doctor noted that McKinney had issues with concentrating, learning, and sleeping. (*Id.*) As a result, McKinney had difficulty "multitasking, being on time . . . [and] trying to do work in a noisy environment." (*Id.*) So the doctor recommended that McKinney receive the following accommodations: "doing paperwork and other clerical functions from home, being late (able to flex time) on occasion, and needing to attend health appointments." (*Id.*)

Chordash scheduled a meeting to discuss accommodations with McKinney for early April. (ECF No. 18-9, PageID.595.) To prepare, she, Smith, and McKinney's then-supervisor met and discussed the possibility of her working from home, but "what the specific accommodations were, the structure of that, we were waiting to— for [McKinney] to share [that]." (*Id.* at PageID.603.)

But McKinney was a "no show" at the meeting. (ECF No. 18-9, PageID.596.) Indeed, McKinney stopped coming to work entirely after April 8, 2019, as she had developed rashes on her face from work-related stress. (ECF No. 18-6, PageID.498–500.)

McKinney exhausted her FMLA leave by mid-April. (ECF No. 18-3, PageID.471.) But she was still eligible for a total of "twelve months of continuous [unpaid] leave" under her collective-bargaining agreement and County policy. (ECF No. 24-3, PageID.818–819, 901.) If that leave were to be exhausted, then HR would

determine if McKinney was entitled to additional leave as an accommodation under the ADA. (*Id.*) But McKinney still needed to submit a request for leave and a new medical certification for that to happen. (*Id.* at PageID.811–813.)

Over the next few weeks, Chordash made several attempts to reach out to McKinney—and eventually to McKinney's lawyer—to obtain the proper documents to support her leave. (*See* ECF No. 18-3, PageID.470 (April 12 letter setting April 29 deadline to respond), PageID.471 (letter from Chordash listing five additional efforts to contact McKinney between April 10 and May 6).)

On May 6, Chordash sent a letter to McKinney explaining that McKinney had been "off work since April 8" and had exhausted all of her FMLA leave as of April 15. (ECF No. 18-3, PageID.471.) Accordingly, she explained, McKinney was "no longer on an approved leave of absence." (*Id.*) The letter continued: "Approval of your leave of absence is contingent on our receipt of the Medical Certification form completed by your physician." (*Id.*) The letter set a May 10 deadline and warned: "If we do not hear from you, or receive this Information from you, we will assume you have voluntarily resigned from your position[.]" (*Id.*)

That same day, McKinney submitted a charge of discrimination with the EEOC. (ECF No. 24-2, PageID.788.)

Chordash heard nothing by the May 10 deadline. (ECF No. 24-3, PageID.859.) But McKinney's lawyer reached out to Chordash on May 13. (ECF No. 24-3, PageID.866.) On that date, Chordash sent another letter and extended the deadline for a third time—to May 17, 2019. (ECF No. 18-3, PageID.472.)

McKinney submitted the medical certification on May 17. (ECF No. 18-13, PageID.720.) Her doctor explained that she was "unable to function" and set the "probable duration" of her condition through June 30, 2019. (*Id.* at PageID.726.)

A few days later, the County approved McKinney's continuous medical leave through July 1, a day after the date proposed by her doctor. (ECF No. 28-3, PageID.1247.) The letter noted that McKinney would continue to receive benefits from the County for up to six months of her time on unpaid leave. (*Id.*) And it informed McKinney that, if she could not return to work on July 2, a leave-of-absence extension (1) "must be filed with [HR] at least five . . . days prior to your leave expiration date" and (2) must include a medical certification. (*Id.*) The letter warned: "If this required documentation is not received In Its entirety, a leave of absence extension may not be approved." (ECF No. 28-3, PageID.1247.) Put differently, to ensure that she could continue on her medical leave, McKinney was required to submit a request for extension and a medical certification by June 26, 2019. (ECF No. 28-2, PageID.1132.)

By July 10, neither McKinney nor her lawyer had requested an extension. (ECF No. 24-3, PageID.882.) So Chordash sent another letter. (ECF No. 28-3, PageID.1254.) It explained: "Human Resources has not received a leave of absence extension request indicating your need for additional leave. Approval of your leave of absence is contingent on our receipt of the Medical Certification form completed by your physician. Therefore, any unscheduled time off from work beginning July 2, 2019 will not be protected under the leave policy[.]" (*Id.*) Chordash continued, "I have enclosed a 3rd request for a leave of absence for you to complete and a Medical

9

Certification . . . Each of these documents are to be returned to Human Resources by July 17, 2019. If we do not hear from you or receive this information from you, we will assume you have voluntarily resigned[.]" (*Id.*)

McKinney was separated from the County on July 19. (ECF No. 18-17, PageID.747.) Though the separation letter noted that McKinney had requested a leave extension on July 17, it advised: "As of today, Human Resources has not received an updated Medical Certification form completed by your physician to support your leave extension request. . . . As a result we are assuming that you have voluntarily resigned from your position." (*Id.*)

The parties dispute whether this was the real reason for McKinney's separation.

When asked if he really believed that McKinney voluntarily resigned, the Human Resources Director said, "yes." (ECF No. 28-2, PageID.1165.) He explained that McKinney was "not responding [to the County's requests] and not showing up to work[,]" despite its "extraordinary efforts" to reach her. (ECF No. 28-2, PageID.1140, 1142.) Or, put simply, he said that the "reason that we had separated employment was because she was not responsive to our requirements under the collective bargaining agreement." (*Id.* at PageID.1158.) In addition, he noted that McKinney continued to receive health insurance, dental insurance, vision insurance, long-term disability, and life insurance from the County, despite not complying with its requirements for leave. (*Id.* at PageID.1132, 1159.) When the medical certifications came in a few days later, he said it was "too late[.]" (*Id.* at PageID.1166.)

10

For her part, McKinney acknowledges that the medical certification was submitted on July 24, 2019, nearly a month after the initial deadline and a week after the amended deadline. (*See* ECF No. 24, PageID.772; ECF No. 28-3, PageID.1263–1271.)

The same day that McKinney's medical certification was submitted, she entered the hospital for an "ER suicide thing." (ECF No. 18-6, PageID.509.) McKinney admits that she was incapable of working the entire next year, i.e., between July 2019 and at least August 2020. (*Id.* at PageID.510–511.)

### B.

McKinney filed this lawsuit in December 2020. (*See* ECF No. 1.) She alleges that the County violated the ADA when it failed to accommodate her disability, when it refused to engage in the interactive process, and when it retaliated against her.

Following discovery, the County filed a motion for summary judgment and McKinney responded. (ECF Nos. 18, 24.) The Court subsequently issued a Rule 56(f) Notice for Additional Briefing, explaining that it "might be inclined to grant summary judgment to the County on the issue of pretext" but the "factual record and briefing on the retaliation claim are currently insufficient." (ECF No. 25, PageID.915–16.) The parties have provided the requested supplements. (ECF Nos. 28, 29.)

Given the adequate briefing and record, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

## II.

"Summary judgment is proper where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(a)). A material fact is "one 'that might affect the outcome of the suit,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.

The ADA prohibits discrimination "against a qualified individual on the basis of disability." See 42 U.S.C. § 12112(a). "Discrimination" is a "general term" that contemplates various theories of harm, including the failure to accommodate a qualified person's known disability, the failure to engage in the interactive process, and retaliation. *See Wells v. Chrysler Grp. LLC*, 559 F. App'x 512, 515 (6th Cir. 2014); *see also* 42 U.S.C. § 12112(b).

McKinney raises each of these claims. The Court will take them in turn.

### A. Failure to Accommodate

The ADA requires certain employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [it] can demonstrate that the accommodation would impose an undue hardship" on the employer. *See* 42 U.S.C. § 12112(b)(5)(A). To establish a

12

prima facie failure-to-accommodate claim, the plaintiff must show (1) that she is an individual with a disability and (2) that she is otherwise qualified for her job despite the disability. *See Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). If the plaintiff satisfies her prima facie burden, the burden shifts to the employer to show that "a challenged job criterion is essential, and therefore a business necessity, or that the proposed accommodation would impose an undue hardship." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 581 (6th Cir. 2001).

The parties agree that McKinney is disabled. (ECF No. 18, PageID.451; ECF No. 24, PageID.774.) But they dispute whether McKinney was "otherwise qualified" for her job.[1]

To be "otherwise qualified," an employee must show that she can perform the essential functions of the position with a reasonable accommodation. *Hostettler*, 895 F.3d at 854. Essential functions are core job duties, not marginal ones. 29 C.F.R. § 1630.2(n)(1); *see also Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018). Determining whether a job function is essential is "highly fact specific[,]" and courts are to consider, among other things, the employer's

---

[1] In reply to the Court's Rule 56(f) Notice, the County provided documents showing that the Social Security Administration determined that McKinney was disabled from April 8, 2019—the last day she came to work—through her separation from the County on July 19, 2019. (ECF No. 29, PageID.1274.) The County argues that her request for Social Security Disability benefits precludes this ADA claim because she essentially admitted that she is not "otherwise qualified" in her application for disability benefits. (*Id.* at PageID.1275 (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999)).) That may be so, but this argument, which was not raised in the initial summary judgment briefing, is not responsive to the Rule 56(f) Notice and will not be considered.

judgment, written job descriptions, and the consequences of not requiring the employee to perform the particular function. *Hostettler*, 895 F.3d at 854; *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 615 (6th Cir. 2020).

McKinney says she would have been otherwise qualified for her job if she could work from home and on a flexible schedule.[2] (ECF No. 24, PageID.777.) The Court disagrees.

Though certainly not true of all jobs, the Sixth Circuit has held that "regularly attending work on-site is essential to most jobs[.]" *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (en banc). "That rule has straightforward application here: Regular and predictable on-site attendance was essential for [McKinney's] position[.]" *See id.* at 763. As will be explained, it was generally not possible for a Supports Coordinator to be productive, keep up with their meeting and recordkeeping responsibilities, and be adequately supervised without regular, in-person attendance. *See Hostettler v. Coll. of Wooster*, 895 F.3d 844, 856 (6th Cir. 2018) ("An employer must tie time-and-presence requirements to some other job requirement.").

Start with the County's judgment that Supports Coordinators generally could not perform the essential functions of their job without regular, in-person attendance. (ECF No. 18, PageID.455.) While not dispositive, *see Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014), there is plenty of evidence to support its judgment. Indeed,

---

[2] The Court follows the parties' lead and considers the work-from-home and flex-time accommodations together. (*See* ECF No. 18, PageID.455; ECF No. 24, PageID.777–778); *see also Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 393 (6th Cir. 2017) (considering whether "a combination of leave, flexible scheduling, and modified break times" was a reasonable accommodation).

the County generally required Supports Coordinators to work in the field or from the office and to diligently track their time, location, and work activities so they could accurately bill Medicaid. (*See* ECF No. 18-7, PageID.557 (first supervisor affidavit); ECF No. 18-9, PageID.620, 628 (Smith's deposition).)

McKinney's own experience shows why regular, in-person attendance was essential for Supports Coordinators. Smith, who supervised McKinney in some capacity throughout the relevant period, concluded that McKinney "had a consistent pattern of not adhering to expectations for attendance, for accountability, for documentation of her schedule, [and for] independently managing her responsibilities in a very consistent basis through 2018 through 2019." (ECF No. 18-9, PageID.617.) He "emphatically" agreed that he needed to take "extraordinary" steps to make sure she did her job. (*Id.* at PageID.618.) He explained: "I personally . . . typed up her due date schedule with all of her cases and every—all the months of the year, pretty much all the documents and responsibilities that she had so she would have a visual to be able to see what she had to do. She was not managing those things independently. She needed to have someone to advise her, support her to get the basic elements of the job done." (ECF No. 18-9, PageID.619.) When asked if he would have recommended that McKinney work from home, he said that she demonstrated a consistent lack of the necessary skills and independence to do so effectively. (*Id.* at PageID.627.) As the Sixth Circuit has noted, "supervision" sometimes "cannot be had in a home office situation." *Ford*, 782 F.3d at 761.

Resisting this conclusion, McKinney says that some Supports Coordinators were permitted to work from home. (ECF No. 24, PageID.777.) But that a work-from-home arrangement "had been provided to others" is all McKinney says. It is "not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 815 (6th Cir. 2022). So, arguably, McKinney waived this argument.

But even if she had not waived this argument, it would not win the day. To the extent that McKinney implies that a work-from-home program for some precludes the County's position that in-person attendance is essential to her job, that is not necessarily the case. *See Ford*, 782 F.3d at 765 (noting that such a conclusion is "180-degrees backward" and would encourage employers to shut down telecommuting programs or risk increasing their liability under the ADA). Indeed, the record suggests that telecommuting was only available to Supports Coordinators who were able to consistently and independently execute the job functions that made in-person attendance essential. As Smith explained, before being approved to work from home, a Supports Coordinator's supervisor had to consider, on a case-by-case basis, if that individual met high performance targets for "productivity, timeliness of documentation, . . . [and] utilizing the . . . calendar to document [their] whereabouts" for the prior three-month period. (ECF No. 18-9, PageID.598.) Or, in McKinney's words, only the "perfect" Supports Coordinators were permitted to work from home. (ECF No. 18-14, PageID.734.) Moreover, there is nothing to suggest that these

16

individuals were permitted to do *all* of their "paperwork and other clerical functions from home," as McKinney apparently wished to do. *See* (ECF No. 18-13, PageID.719); *Ford*, 782 F.3d at 764 (noting that this argument "might work if the other employees' [telecommuting] schedules were materially similar [to the proposed accommodation]"). So this argument does not do much to undermine the County's stated belief that in-person attendance is essential to the job. If anything, the County's high work-from-home standards point the other way.

Next consider the Supports Coordinator job description. The 2017–18 job description lists the following as "essential functions" of the job: "complet[ing] Macomb County Community Mental Health record keeping requirements, including clinical records . . . and statistical reports" and "participat[ing] in . . . supervision". (ECF No. 18-5, PageID.477); *see also Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 392 (6th Cir. 2017) (explaining that job descriptions prepared prior to litigation are properly considered). This supports a finding that timely and accurate recordkeeping and availability for supervision were essential functions of the job.

Now consider the consequences of permitting McKinney to work from home, where she would have even less of the supervision she needed to do the essential functions of her job. As in *Ford*, McKinney's poor performance—even with intensive supervision—"caused strife [for] those around her." *See* 782 F.3d at 763. Smith testified that "recordkeeping is [an] absolute requirement of Medicaid" and agreed that the "failure to perform those actions . . . would trigger action from Medicaid." (ECF No. 18-9, PageID.614.) Another of McKinney's supervisors explained that

17

recordkeeping was "necessary for the department to be reimbursed for the services provided." (ECF No. 18-7, PageID.553.)

In addition to that risk, County staff and consumers suffered from McKinney's failure to complete certain tasks. Smith explained that from the fall of 2018 to the time that McKinney stopped coming to work in April 2019, several of her consumers had to be reassigned to other Supports Coordinators. (ECF No. 18-9, PageID.620–621.) Indeed, Smith testified that some cases were reassigned because consumers "were not happy with [McKinney's] work . . . . [F]amilies would say 'I don't want . . . to work with [McKinney] anymore.'" (*Id.* at PageID.621.) Moreover, Smith noted that McKinney "would go through periods of time where she would not see all of her [consumers] on a monthly basis as required . . . . It's technically a receiving rights violation." (*Id.* at PageID.624.) And perhaps worst of all, "there were some cases where authorizations weren't submitted, and services were not received as a result. So the family didn't get other services . . . they are expected to get." (*Id.* at PageID.625–626.)

For her part, McKinney acknowledged that she sometimes fell behind on her recordkeeping and that at least one consumer asked to be removed from her caseload. (ECF No. 18-6, PageID.495–496, 535.) And she admitted that she "couldn't write the report[s] like [her supervisors] wanted[.]" (*Id.* at PageID.531; *see also id.* at PageID.496 (McKinney's deposition: "Q. And you're saying that when you saw the client, you couldn't write the report. A. Not well. So it came back yucky.").) Moreover, McKinney agreed that her disabilities "hampered [her] ability to perform the job at

18

the level [she] or [the County] thought [it] should be performed[.]" (*Id.* at PageID.515.)

While McKinney thought these deficiencies would be improved if she could work from home, "an employee's unsupported testimony that she could perform her job functions from home does not preclude summary judgment, for it does not create a genuine dispute of fact. Neither the statute nor regulations nor EEOC guidance instructs courts to credit the employee's opinion about what functions are essential." *See Ford*, 782 F.3d at 763–64.

Finally, "common sense" supports the outcome here. *See Ford*, 782 F.3d at 762. As already explained, during the relevant timeframe, each of McKinney's supervisors put McKinney on PIPs that noted that McKinney could not do her job without intensive, hands-on supervision. And such supervision would have been considerably more difficult if McKinney worked from home. In addition, each of McKinney's supervisors noted that her attendance records frequently failed to accurately reflect her hours and whereabouts. (ECF No. 18-7, PageID.552 (first supervisor); ECF No. 18-9, PageID.584 (Smith); ECF No. 18-11, PageID.639 (final supervisor).) As Smith explained, "many times when I would look at Find My Friend app [when McKinney should have been in the field], it would show she had not left her residence. She would either change the calendar after the fact and/or email or text she was using FMLA for the day." (ECF No. 18-9, PageID.584.) So permitting McKinney to work from home would likely have made tracking, reconstructing, and billing her time more difficult, too. As the Sixth Circuit recently explained, "an accommodation is likely unreasonable if it frustrates attendance or creates an unlimited ability to leave

19

work[.]" *See Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812 (6th Cir. 2020) (internal quotation marks omitted).

To sum up, McKinney was required to show that she was "otherwise qualified" to be a Supports Coordinator, meaning that she could perform the essential functions of the position with a reasonable accommodation. Her proposed accommodation was working from home and on a flexible schedule. But the record shows that she could not be productive, keep up with her recordkeeping responsibilities, or be adequately supervised without regular, in-person attendance. So telecommuting and flex time were not reasonable accommodations because they would have removed essential functions of her job.

Because McKinney is unqualified as a matter of law, the County is entitled to summary judgment on her failure-to-accommodate claim.

## B. Interactive Process

McKinney also argues that the County violated the ADA when it failed to engage in the interactive process to determine potential reasonable accommodations. (ECF No. 24, PageID.774.)

True, the ADA requires an employer to "initiate an informal, interactive process with the individual with a disability in need of the accommodation" in a good faith effort to identify potential accommodations. *See* 29 C.F.R. § 1630.2(o)(3). But the Sixth Circuit has made clear that "if the employee fails to create a genuine dispute of material fact that a reasonable accommodation would have allowed her to perform the essential functions of her job, she cannot survive summary judgment on an

interactive-process claim." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (en banc). So the conclusion that McKinney failed to identify a reasonable accommodation makes it unnecessary to consider whether the County failed to engage in the interactive process.

The County is entitled to summary judgment on this claim, too.

### C. Retaliation

Finally, McKinney argues that the County retaliated against her when it ended her employment in July 2019. (ECF No. 24, PageID.779.)

"Discrimination here means retaliation—that 'but for' an employee's statutorily protected activity the employer would not have taken the 'adverse employment action.'" *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). Because McKinney does not present any direct evidence of retaliation, her "retaliation claim falls under the *McDonnell Douglas* burden-shifting approach." *See A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). Under this framework, the initial prima facie burden falls on McKinney. *Id.* If she meets it, then the "burden shifts to the [County] to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* McKinney must then show that the reason given by the employer was actually a pretext designed to mask retaliation. *Id.*

As explained in the Rule 56(f) Notice, the Court assumes without deciding that the first two steps have been satisfied. (*See* ECF No. 25.) At step one, McKinney shows

that her request for leave was protected activity,[3] that the County knew she was requesting leave, that she was separated, and that there was short temporal proximity between the request and separation. (ECF No. 24, PageID.781.) And at step two, the County says that McKinney voluntarily resigned when she failed to submit the required medical certifications by the deadline, as required by the collective-bargaining agreement. (ECF No. 18-17, PageID.746; ECF No. 28-2, PageID.1140, 1158.)

That leaves pretext. "Defeating a properly supported summary-judgment motion in these circumstances requires the plaintiff to produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant[] . . . did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Back v. Nestle USA, Inc.*, 694 F.3d 571, 579 (6th Cir. 2012). "A plaintiff can establish pretext by demonstrating that the defendant's articulated legitimate, nondiscriminatory reason either: (1) lacks a basis in fact, (2) did not actually motivate her discharge, or (3) was insufficient to motivate her discharge[.]" *Vincent v. Brewer Co.*, 514 F.3d 489, 497 (6th Cir. 2007). The ultimate question is: "did the employer fire the employee for the stated reason or not?" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

---

[3] Though medical leave can be a reasonable accommodation under the ADA, *see Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017), neither party addressed McKinney's requests for leave as part of her failure-to-accommodate claim. Perhaps they declined to do so because indefinite leave is generally not reasonable. *Id.*

McKinney has not met her burden. In her response to the Rule 56(f) Notice, McKinney focuses almost exclusively on the County's alleged failure to accommodate her and its failure to engage in the interactive process as evidence of pretext. (*See* ECF No. 28, PageID.1073–1078.) The Court understands these arguments to suggest that the County had a bad-faith motivation to end McKinney's employment.

The failure-to-accommodate argument does little, if anything, to show pretext for retaliation. McKinney says that "[w]hile management continued to focus on challenging [her] leave of absence status and demanding more documentation, she was waiting to complete the process under the ADA on her request for accommodations. She wanted to return to work with restrictions, as allowed by the ADA." (ECF No. 28, PageID.1076.) As already explained at length, McKinney was not otherwise qualified for her job with the work-from-home/flex-time accommodation that she sought. And because McKinney's doctor told the County that she needed medical leave, it made perfect sense for the County to be "more focused on the leave." (ECF No. 28, PageID.1079.) Indeed, in May 2019—two months before the separation—McKinney's doctor reviewed the Supports Coordinator job description, determined that her conditions made it "medically necessary for [her] to be absent from work," and concluded that McKinney was "incapacitated," "unable to function," and "not improving." (ECF No. 18-13, PageID.726.) And the doctor set the probable duration of her condition through June 30, 2019. (*Id.* at PageID.725.) Because the County approved her leave based on the date in the medical certification, it made sense for the County to ask for an updated certification once that date passed. (ECF

No. 24-3, PageID.818–819 (Chordash explaining leave-approval process); ECF No. 28-3, PageID.1247 (leave-approval letter).) McKinney does not explain why, in light of this information, the County should have been focused on getting her back to work rather than on seeking documentation to extend her leave.

Likewise, the interactive-process arguments do not move the needle. McKinney argues that "from April to the point of [her] termination . . . the County never completed the interactive process so that [her] request for accommodation can be met." (ECF No. 28, PageID.1078.) As already explained, the interactive-process claim fails because McKinney did not identify a reasonable accommodation. And as further explained, McKinney stopped coming to work—and her doctor told the County that she could not work—during this time. According to the HR Director, this meant that McKinney "would have to return to work with a doctor's clearance" before the interactive process could proceed. (ECF No. 28-2, PageID.1155; ECF No. 28-3, PageID.1247 (leave-approval letter explaining requirements to return to work).) Put differently, the "relevant interactive process was not triggered until [McKinney] was released to return to work" following her medical leave. *See Arndt v. Ford Motor Co.*, 716 F. App'x 519, 528 (6th Cir. 2017). So this delayed interactive process does nothing to show pretext.

In any event, it defies the record, and reason, to suggest that the County did not make a good faith effort to help McKinney keep her job during this time. In early April, Chordash, Smith, and a few others met internally to discuss potential accommodations, and they set a meeting with McKinney for April 8. (ECF No. 18-9,

24

PageID.595, 603.) McKinney was a "no show" and did not come to work from that point forward. (ECF No. 18-9, PageID.596.) Over the next few months, Chordash reached out to McKinney or her lawyer more than half-a-dozen times, each time requesting the necessary paperwork to support her leave. (ECF No. 18-3, PageID.470–472; ECF No. 28-3, PageID.1254.) More often than not, she was ignored. Yet Chordash continued to extend the relevant deadlines. Only after repeated warnings and missed deadlines did the HR Director determine that the department "had spent enough of [its] administrative time trying to get [McKinney] to be responsive[.]" (ECF No. 28-2, PageID.1147.) McKinney points to no evidence to suggest that she was entitled to further leniency.

Other than these arguments, McKinney alleges that three fact disputes preclude a grant of summary judgment on pretext. First, she points out that the HR Director said the decision to separate McKinney was made by the "team," while Chordash said it was the Director's decision. (ECF No. 28, PageID.1073.) Second, says McKinney, Chordash said she showed the medical certifications to the HR Director when they arrived on July 24, while he said he did not look at them. (*Id.* at PageID.1074.) Third, she says that the HR Director had "no knowledge of [her] medical conditions and limitations at the time he fired her," suggesting that he was just looking for an excuse to end her employment. (*Id.* at PageID.1076.)

But taken in their full context, no such "fact disputes" exist. On the first, the HR Director said: "I'm certain that we had conversations with the entire team about this [separation] letter going out. And I'm certain that I would have said I'm good

with this, you may send that letter." (ECF No. 28-2, PageID.1145.) He agreed that the letter would not have been sent without his approval. (*Id.*) So the challenged testimony is actually consistent—it was the team's decision to send the letter, and the HR Director agreed with and approved that decision. Same with the second "fact dispute." The HR Director said: "I recall [Chordash] coming to me and saying that we had gotten additional documentation," but he declined to review it because it had come "too late[.]" (ECF No. 28-2, PageID.1166.) On the third, the HR Director said that while he did not know McKinney's exact medical problems, he knew that "she was on a leave of absence because of a mental health related condition. I would know the extraordinary efforts we had taken in the past to try to get her to respond to us. . . . I ha[d] to make a decision as to whether or not we are going to continue to [absorb] the administrative overhead of doing that over and over and over again[.]" (ECF No. 28-2, PageID.1146–1147.) Put differently, the HR Director did not need to review McKinney's medical documentation because her employment ended due to her failure to comply with the County's collective-bargaining agreement. Thus, none of these are genuine disputes of material fact that could preclude summary judgment on the retaliation claim.

In sum, McKinney failed to meet her burden to show the reason for the separation was pretextual. "A plaintiff facing a summary judgment motion cannot 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat

the motion." *Tingle*, 692 F.3d at 533 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). This claim will be dismissed.

## IV.

For the foregoing reasons, the Court GRANTS the County's motion for summary judgment. (ECF No. 18). A separate judgment will follow.

SO ORDERED.

Dated: June 6, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE